UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-62617-CIV-ALTMAN

UNITED STATES OF AMERICA
ex rel. MARISELA CARMEN MEDRANO
and ADA LOPEZ,

      Plaintiffs,

v.

DIABETIC CARE RX, LLC, d/b/a
PATIENT CARE AMERICA;
RIORDAN, LEWIS & HADEN, INC.;
PATRICK SMITH; and
MATTHEW SMITH,

      Defendants.

_____/

**UNITED STATES' CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS UNITED STATES' FIRST AMENDED COMPLAINT**

      As alleged in the United States' First Amended Complaint ("Amended Complaint"), Defendants Patient Care America ("PCA"), Riordan, Lewis & Haden ("RLH"), Patrick Smith, and Matthew Smith defrauded TRICARE, the federal health care program for military members and their families, by paying marketers tens of millions of dollars in kickbacks to generate referrals of expensive, often unnecessary, prescriptions for pain and scar creams, by waiving patients' copayments, and by claiming reimbursement for prescriptions written by physicians who had never seen or spoken to the patients. These schemes—though lasting only a few months—cost taxpayers approximately $72 million.

      The Amended Complaint sets forth each Defendant's role in the schemes: PCA, the pharmacy that paid kickbacks and submitted the resulting claims for reimbursement from TRICARE; RLH, the private equity company that managed PCA on behalf of its investors, approved the kickback agreements, and financed the kickbacks; and Patrick and Matthew Smith, the officers of PCA who executed the schemes. The Amended Complaint contains over a hundred paragraphs alleging the particulars of nine representative claims that PCA submitted to TRICARE

pursuant to the schemes.  The Amended Complaint also alleges the "specific representations" that PCA made to TRICARE during the claim submission process, thus curing the deficiency that Judge Bloom identified in the government's original complaint.

Defendants' actions violate the False Claims Act ("FCA"), which creates a civil cause of action against those who knowingly submit or cause the submission of false claims to federal health care programs, make or use false statements or records material to a false claim, or conspire to do so.   It is blackletter law, established by statute and decades of case law, that violations of the Anti-Kickback Statute ("AKS"), which criminalizes the payment of bribes to induce referrals of prescriptions, may also serve as the basis for civil FCA liability.  In moving for dismissal of the government's Amended Complaint, the Defendants ask the Court to adopt an extraordinary view that claims to federal health care programs resulting from violations of the AKS are not false under the FCA, or are false in only exceptionally narrow circumstances.  The Court should follow virtually every decision that has considered the issue and hold that particularized allegations of an AKS violation sufficiently pleads the falsity element of an FCA claim.  The Court should further rule, consistent with Magistrate Judge Valle's Report and Recommendation, that the Amended Complaint sufficiently pleads all other necessary elements under the FCA, including materiality, scienter, and causation.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 16, 2018, the United States filed its original complaint in intervention, ECF No. 36, alleging that Defendants PCA, RLH, Patrick Smith, and Matthew Smith knowingly submitted or caused the submission of false claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).  The complaint also alleged two common law claims against PCA.  The alleged violations were based on three schemes: (1) submission of false claims to TRICARE for prescriptions referred to PCA by marketers in exchange for the payment of kickbacks, in violation of the AKS; (2) waiver of TRICARE patient copayments, in violation of the AKS; and (3) submission of false claims to TRICARE for prescriptions lacking a valid patient-prescriber relationship, in violation of state law and TRICARE regulations. *See, e.g.*, Am. Compl. ¶¶ 1–2.

On April 17, 2018, each Defendant filed a motion to dismiss, ECF Nos. 51–54, which Judge Bloom referred to Magistrate Judge Valle, ECF No. 82.  On November 30, 2018, Magistrate Judge Valle issued a Report and Recommendation ("R&R") that rejected nearly all arguments Defendants raised.  ECF No. 100.  Among other things, the R&R concluded:

- The United States' representative claims "provide the requisite indicia of reliability under Rule 9(b)" that false claims were submitted, R&R at 20 n.14;
- The complaint alleges materiality, scienter, and causation with sufficient particularity as to all Defendants with respect to the payment of kickbacks to marketers, *id.* at 21–23, 26–27;
- The complaint sufficiently alleges materiality, scienter, and causation as to PCA and Matthew Smith as to the copayment waiver scheme and the lack of a valid patient-prescriber relationship, *id.* at 26–29; and
- The complaint adequately alleges common law claims against PCA, *id.* at 29–30.

The R&R nevertheless recommended dismissal of the government's FCA count, with leave to amend, on the ground that it insufficiently pleaded falsity under an implied or express false certification theory. With respect to implied false certification liability, the R&R concluded it was necessary to allege "specific representations" that render PCA's failure to disclose its non-compliance with statutory, regulatory, or contractual requirements a "misleading half-truth," and concluded that the complaint had failed to do so. *Id.* at 20. The R&R also concluded that the complaint did not adequately allege Patrick Smith's or RLH's scienter as to the copayment waiver scheme or the patient-prescriber scheme, but concluded that the complaint did allege their scienter and causation as to the marketer kickback scheme.

On March 6, 2019, Judge Bloom dismissed the government's FCA claim in its original complaint, with leave to amend, because the complaint did not contain allegations that PCA made "specific representations" in the claims submission process. Order Adopting in Part Report and Recommendations at 10–12, ECF No. 142. Judge Bloom affirmed the sufficiency of the government's common law claims of Payment by Mistake and Unjust Enrichment against PCA.

On March 18, 2019, the United States filed its First Amended Complaint in Intervention. ECF No. 147. The Amended Complaint significantly expands the government's allegations concerning the "specific representations" made by PCA during the TRICARE claims submission process with respect to nine representative claims, which are examples of the thousands of fraudulent TRICARE claims resulting from the alleged schemes. The Amended Complaint also expands the allegations concerning the FCA elements of materiality, scienter, and causation, and adds a false records or statements claim against all Defendants under 31 U.S.C. § 3729(a)(1)(B), and a conspiracy claim against PCA and RLH under 31 U.S.C. § 3729(a)(1)(C).

On April 1, 2019, each Defendant filed a motion to dismiss the FCA counts in the United States' Amended Complaint. ECF Nos. 148–151 ("PCA MTD," "RLH MTD," "PS MTD," and

3

"MS MTD").  The case was subsequently assigned to Judge Altman and Magistrate Judge Hunt for all further proceedings.  ECF Nos. 156–57.  As set forth in this memorandum, the Court should deny Defendants' motions to dismiss because the Amended Complaint amply pleads every required element of the FCA claims brought against them.

## LEGAL BACKGROUND

### I.    The False Claims Act

The False Claims Act was enacted to combat fraud against the federal government.  As the Supreme Court has explained, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (internal quotation marks and citation omitted); *see also* S. Rep. No. 99-345, at 2 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266 (the FCA is "the Government's primary litigative tool for combating fraud").

The FCA, among other things, imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  Under Section 3729(a)(1)(A), liability exists either where the defendant directly submits a false claim or where the defendant causes another to submit a false claim.  The FCA also imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), or who "conspires to commit a violation of subparagraph (A) [or] (B)," *id.* § 3729(a)(1)(C).

 The FCA defines "knowingly" as "actual knowledge," "reckless disregard," or "deliberate ignorance" of truth or falsity, and expressly "require[s] no proof of specific intent to defraud." *Id.* § 3729(b)(1).  A false claim is "material" if it has a natural tendency to influence, or is capable of influencing, the government's payment decision.  *Id.* § 3729(b)(4); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).  A person who violates the FCA is liable to the United States for civil penalties and three times the amount of the government's damages.  31 U.S.C. § 3729(a)(1).

### II.    The Anti-Kickback Statute

The AKS, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided

that are medically unnecessary, of poor quality, or potentially harmful to a vulnerable patient population. *See United States v. Patel*, 778 F.3d 607, 615–17 (7th Cir. 2015) (discussing how kickbacks may corrupt the health care system, lead to costly overutilization, subvert patient choice, and result in the provision of harmful, unnecessary, or sub-par medical care). To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback could be shown to have given rise to overutilization or a lower quality of care.

The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. *See United States v. Vernon*, 723 F.3d 1234, 1251–52 (11th Cir. 2013). In pertinent part, the statute provides:

> (b)     Illegal remuneration . . .
>
> > (2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
> >
> > > to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . .
> >
> > shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b. The AKS has a corresponding provision prohibiting "knowingly and willfully solicit[ing] or receiv[ing]" such remuneration. *Id.* § 1320a-7b(b)(1). In addition to criminal penalties, violations of the AKS can subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties. *Id.* § 1320a-7(a)(7), (b)(7).

In the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 757 (2010), Congress made clear that a claim to federal health care programs that violates the AKS is *per se* a false or fraudulent claim under the FCA. *See* 42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section . . . , a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").  Even prior to enactment of the PPACA, the Eleventh Circuit and

numerous other courts had held that compliance with the AKS is a condition of payment under federal health care programs and that violations of the AKS were therefore actionable under the FCA. *See*, *e.g.*, *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005).

To prove an underlying violation of the AKS, the government must show that the defendant acted "knowingly and willfully." To act knowingly, a defendant must have acted "voluntarily and intentionally and not because of a mistake or by accident." *United States ex rel. Williams v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-130, 2014 WL 2866250, at *12 (M.D. Ga. June 24, 2014). Willfully means that an "act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837–38 (11th Cir. 1998). The government does not need to show that the defendant acted with specific intent to violate the AKS. 42 U.S.C. § 1320a-7b(h). The government need only show that "the defendant acted with the intent to do something the law forbids—even if he is not aware of the specific law his conduct may violate." *Williams*, 2014 WL 2866250, at *13.

Taken together, to plead FCA liability predicated on an underlying violation of the AKS, the government must allege an underlying violation of the AKS and that Defendants knowingly submitted or caused the submission of claims to federal health care programs for a patient referred by the recipient of the kickback.

### III.   <u>Legal Requirements For Valid Prescriptions</u>

Under Florida law, pharmacies may dispense prescription drugs only on the basis of a valid prescription. In particular, pharmacies are prohibited from dispensing prescription drugs "when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship that includes a documented patient evaluation, including history and a physical examination adequate to establish the diagnosis for which any drug is prescribed." Fla. Stat. § 465.023(1)(h). Pharmacies violating this prohibition may have their licenses revoked or suspended and are subject to fines, probation, or other discipline by the state board of pharmacy. *Id.* § 465.023(1).

TRICARE requires that pharmacies comply with such state laws "in the state in which the pharmacy is located." 32 C.F.R. § 199.6(d)(3). Similarly, in an August 29, 2012 provider

agreement executed by PCA and Express Scripts, Inc. ("ESI"),[1] PCA promised not to "submit a claim to ESI until it has preliminarily determined . . . that the prescription presented is valid and issued in accordance with applicable laws, rules and regulations."  Am. Compl. ¶ 33.  ESI also expressly reserved the right to reverse claims where PCA failed to "verify that the prescription was issued in accordance with applicable laws, rules and regulations."  *Id.* ¶ 34.

## IV.   Standards For A Motion To Dismiss Under Federal Rules Of Civil Procedure 12(b)(6), 8(a)(2), and 9(b)

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a district court must accept the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff—here, the United States.  *See Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004); *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). Dismissal under Rule 12(b)(6) is inappropriate unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Magluta*, 375 F.3d at 1273 (citations and internal quotation marks omitted).

Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the plaintiff is entitled to relief, thereby giving the defendant fair notice of the basis for relief.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Supreme Court has clarified that to satisfy Rule 8(a)(2) at the motion to dismiss stage, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Thus, all that is required to defeat a motion to dismiss is a complaint that sets forth sufficient factual allegations to plausibly support the relief requested.  *See Twombly*, 550 U.S. at 570.

With respect to the United States' allegations in this case, Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting fraud and mistake be stated with particularity, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Rule 9(b), while requiring particularity, must not be interpreted to "abrogate the concept of notice pleading."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

---

[1] ESI is TRICARE's pharmacy benefits manager.

## ARGUMENT

**I.      The Complaint States A Claim Under 31 U.S.C. § 3729(a)(1)(A)**

The FCA establishes civil liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  A claim for presentment of false claims under Section 3729(a)(1)(A) has five elements: (1) there must be a *"claim"* as defined in 31 U.S.C. § 3729(b)(2); (2) the claim must be *"false or fraudulent"*; (3) the falsity must be *material* to the government's payment decision; (4) the defendant must have either *"present[ed], or caus[ed] to be presented"* the materially false claim, and (5) the defendant must have acted *"knowingly"* as defined in 31 U.S.C. § 3729(b)(1).  The Amended Complaint sufficiently alleges each element required under Section 3729(a)(1)(A) against all Defendants.

**A.      The Complaint Sufficiently Alleges that Claims Were Submitted under Three Fraud Schemes to the TRICARE Program**

The Amended Complaint sufficiently alleges that PCA submitted claims to TRICARE for prescriptions that were referred by third-party marketers, that lacked a valid patient-prescriber relationship, and for which no copayment was collected.

Liability under Section 3729(a)(1)(A) exists only for false claims on the public fisc.  *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  Fraud directed solely at private insurers, for example, does not result in FCA liability.  The Eleventh Circuit accordingly requires that the submission of claims be pleaded with sufficient particularity under Rule 9(b) to provide "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government."  *Id.*  An FCA plaintiff may therefore not simply allege the existence of a fraud scheme and then argue that resulting claims requesting "illegal payments must have been submitted, were likely submitted or should have been submitted to Government."  *Id.*  FCA plaintiffs may satisfy Rule 9(b) by several methods including by "[p]roviding exact billing data," "attaching a representative sample claim," or alleging "first-hand knowledge of defendants' submission of false claims."  *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014).

In accordance with Eleventh Circuit law, the United States sufficiently alleges that claims were submitted to TRICARE by setting forth the particulars of nine representative claims.  Am.

Compl. ¶¶ 211–339.  Magistrate Judge Valle has previously recognized the sufficiency of the representative claims in the government's original complaint.  *See* R&R at 20 n.14.  Nevertheless, the government has significantly expanded its allegations concerning the representative claims in the Amended Complaint.  For each representative claim, the Amended Complaint alleges:

- An abbreviated patient name;

- A prescription number, the date the prescription was written, the identity of the prescriber, and that the prescription was written without an examination of the patient;

- The identity of the marketer that referred the prescription to PCA, the date of the referral, the date that PCA paid the kickback to the marketer, and, for eight of the nine example claims, the exact amount that PCA paid as a kickback for the prescription;

- The date that PCA filled the prescription and submitted the claim to TRICARE, as well as the specific representations that PCA made in the reimbursement claim submitted to TRICARE;

- For the patients referred by TeleMedTech, that the patients did not pay a copayment; and

- That PCA did not disclose at the time of the claim or otherwise that the prescription was referred pursuant to an illegal kickback scheme, that the copayment was waived, or that there was not a valid patient-prescriber relationship.

*See* Am. Compl. ¶¶ 211–339.  These claims are merely examples of a much larger universe of fraudulent claims submitted by PCA; the Amended Complaint alleges that PCA, in total, submitted approximately 10,800 paid claims to TRICARE between September 1, 2014, and April 29, 2015, for prescriptions referred by the three marketers, and that TRICARE paid approximately $72 million on those claims, $16 million of which also had a copayment satisfied through PFARN, the fraudulent charity used to waive the copayments of TeleMedTech patients.  *Id.* ¶¶ 209–10.

The representative claims are sufficient to meet the requirements of *Clausen* and Rule 9(b).  In *McNutt*, for example, the Eleventh Circuit held the government sufficiently alleged representative claims in the context of FCA causes of action predicated on violations of the AKS.  423 F.3d at 1260.  In that case, the government alleged:

> An example of such a transaction is found in Patient A, who received a prescription dated April 24, 2001.  Burleson submitted the claim form on June 11 and/or 13, 2001 for reimbursement for patient A. Another example of the said transactions is found in Patient B who received a prescription dated September 30, 2001.  Burleson

submitted the claim form on November 16, 2001. Vicky Wesson received a commission for the referral of patients A and B.

*Id.* at 1258 (quoting the government's complaint). On the basis of these allegations and similar allegations for two additional patients, the Eleventh Circuit concluded that the allegation that false claims were submitted was not "general or speculative," because "the government has identified as false numerous specific claims the [defendants] made to the federal government." *Id.* at 1260. Here, the government's representative TRICARE claims contain all the information deemed sufficient in *McNutt* and more, such as the date and manner that PCA paid the kickback, the entity paying the kickback, the amount of the kickback, the details contained in the reimbursement claim, and the date and amount that TRICARE paid on the claim. The Amended Complaint accordingly sufficiently alleges that the fraud resulted in false claims on the public fisc.

In its motion to dismiss, PCA largely concedes the sufficiency of the representative claims. PCA's sole objection is that the representative claims fail to identify the "PCA employee or representative" who "paid a kickback," "was involved in or aware of the lack of a valid prescriber-patient relationship," or "made any representation," (*i.e.*, submitted the claim to TRICARE). PCA MTD at 15–17. Although PCA insists that these details must be alleged, it does provide any legal authority supporting its position. PCA's argument ignores that the *Clausen* inquiry focuses on whether the government actually received claims under the alleged fraud schemes. Moreover, PCA's argument ignores that the FCA provides for corporate liability, *Cook Cnty.*, 123 S. Ct. at 1244, and that the Government is suing *PCA as an entity* for submission of false claims. The operative legal question is therefore whether *PCA as an entity* paid kickbacks, waived copayments, filled invalid prescriptions, and submitted the resulting claims to the TRICARE program. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007) ("The identity of the natural person within the corporate defendant who submitted false claims is not an essential element of a FCA violation."); *accord United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015); *United States v. Rite Aid Corp.*, No. 2:11-cv-11940, 2018 WL 1744796, at *6 (E.D. Mich. April 11, 2018). There is no question that the representative claims establish these facts as to PCA as an entity. Although PCA cites *Hopper v. Solvay*, 588 F.3d 1318, 1326 (11th Cir. 2009) and *United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790–91 (11th Cir. 2018), neither case supports its position. In those cases, the relator did not identify *any* particular patients or provide *any* representative claims submitted to federal health

care programs.  Moreover, the very language that PCA quotes from *Hopper* undercuts PCA's argument: *Hopper* acknowledges that a complaint could meet the requirements of Rule 9(b) by alleging "a specific person *or entity* that is alleged to have presented a claim."  588 F.3d at 1326 (emphasis added).

Matthew Smith and RLH further argue that the Amended Complaint does not sufficiently allege their individual involvement with respect to the representative claims.  RLH MTD at 13–14; MS MTD at 7–11.  But they disregard that the representative claims refer back to prior allegations in the Amended Complaint to establish how they caused the submission of the claims. *See, e.g.*, Am. Compl. ¶ 225 ("RLH, Patrick Smith, and Matthew Smith knowingly caused the submission of this claim as alleged in paragraphs 1 through 210 above.").  Causation as to Matthew Smith and RLH is discussed in Section I.D., *infra*, and is established, among other things, by their respective signing and approving the illegal kickback contracts and RLH's financing of kickbacks by PCA.  To require that these allegations be repeated in the representative claims—as RLH and Matthew Smith advocate—would be a meaningless formality.[2]  Moreover, Matthew Smith's arguments are undercut by the fact that the Amended Complaint alleges that he had a direct role in the claims submission process, because he personally received the referral of many of the representative claim prescriptions from the marketers under the kickback arrangements. *See, e.g.*, Am. Compl. ¶¶ 214, 270, 313.

**B.      PCA's Claims to TRICARE Are "False or Fraudulent"**

The Amended Complaint sufficiently alleges that PCA's claims to the TRICARE program are false due to violations of the AKS and state patient-prescriber laws.  Because of these underlying legal violations, PCA's claims are false under either an implied or express false certification theory and by virtue of 42 U.S.C. § 1320a-7b(g), which provides that claims to federal health care programs resulting from AKS violations are "false or fraudulent" under the FCA.

Virtually every court to consider the issue has found that federal claims tainted by AKS violations are false under one of these (or other) theories of falsity. *See McNutt, Inc.*, 423 F.3d at 1260; *Mastej*, 591 F. App'x at 705 & n.11; *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x

---

[2] Matthew Smith's reliance on cases such as *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) and *Hopper*, 588 F.3d 1318, is misplaced, because the relator in those cases did not allege any representative claims at all.  The cases do not stand for the proposition that each defendant must be individually discussed in the representative claims.

783, 799 (11th Cir. 2014); *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1273 (11th Cir. 2018); *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 95 (3d Cir. 2018); *United States ex rel. Schiff v. Marder*, 208 F. Supp. 3d 1296, 1316–17 (S.D. Fla. 2016); *United States v. Marder*, No. 13-cv-24503, 2015 WL 13264207, *3 (S.D. Fla. May 14, 2015); *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1278–79 (M.D. Fla. 2011); *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-cv-10601, 2018 WL 1996829, *4–6 (D. Mass. April 27, 2018); *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54–56 (D. Mass. 2011); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 363 (S.D.N.Y. 2014); *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 812–18 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018). Indeed, this recitation of cases is only the beginning of the case law finding the falsity of AKS-tainted claims: "Legion other cases have held violations of AKS and Stark can be pursued under the FCA[.]" *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008). Although these cases sometimes use different terminology and rely on various legal provisions, agreements, cost reports, and claims, the central reasoning is the same: a claim submitted to a federal health care program that is tainted by AKS violations is false because compliance with the AKS is a fundamental condition of payment under those programs.

Despite this near-universal recognition, PCA in effect argues that AKS violations are not a basis for falsity under the implied false certification theory or under Section 1320a-7b(g), and are false under the express false certification theory only in exceptionally narrow circumstances. PCA MTD at 7. PCA's position has no basis in law; it does not cite a single case that establishes the sweeping proposition it advances and makes no attempt to distinguish decades of precedent finding the AKS to be a basis for falsity under the FCA. The Court should therefore reject PCA's arguments and, consistent with the broad consensus of decisions, conclude that federal health care claims resulting from AKS violations, as well as claims for prescriptions violating patient-prescriber laws, are false.

## 1.   **The Amended Complaint Alleges Facts Sufficient to Support the Implied False Certification Theory of Falsity**

The Court need look no further that the implied false certification theory to find the falsity of PCA's TRICARE claims. In *Escobar*, the Supreme Court affirmed the validity of the implied

false certification theory "at least" when two conditions were satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  136 S. Ct. at 2001.

The Amended Complaint satisfies the conditions set out in *Escobar* for implied false certification.  Judge Bloom dismissed the government's original complaint, with leave to amend, because she found it did not contain sufficient allegations that PCA made "specific representations" in the claims submission process.  Order at 10–12.  The government has since amended its complaint to allege additional "specific representations" made by PCA during the TRICARE claims submission process, which include representations about the patient, the prescriber, the prescription, the drugs actually dispensed and their cost, and the pharmacy.  *See* Am. Compl. ¶¶ 41, 218, 232, 246, 260, 274, 288, 303, 318, 333.

While making these representations, PCA did not disclose that the claims it submitted to TRICARE violated various statutory, regulatory, and contractual requirements, including the AKS, 42 U.S.C. § 1320a-7b(b), TRICARE's anti-fraud and abuse provisions, 32 C.F.R. § 199.9(a)(4), (b)(1), (c)(12), the express promises that PCA made in its provider agreement with ESI, and state law governing the patient-prescriber relationship.  *See* Am. Compl. ¶¶ 41, 219–20, 233–34, 247–48, 261–62, 275–76, 289–90, 304–05, 319–20, 334–35.    These regulatory violations—as discussed at Section I.C., *infra*—would have affected TRICARE's payment decision had it known about them at the time of submission and are therefore material. Accordingly, the Amended Complaint meets both prongs of *Escobar*'s two-part test by establishing (1) that PCA's TRICARE claims do not "merely request payment, but also make[] specific representations about the goods or services provided"; and (2) that PCA's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  136 S. Ct. at 2001.

PCA and Matthew Smith contend that PCA's claims are not false under an implied false certification theory because the representations PCA made in its TRICARE claims were not "misleading" in light of PCA's failure to disclose its non-compliance with the AKS and patient-prescriber laws.  PCA MTD at 8–9; MS MTD at 15–16.  This position is impossible to square with *Escobar*.  In *Escobar*, the Supreme Court held that the claims were false because the defendant

made representations that it had provided counseling services, but the services were provided by individuals who did not meet various Massachusetts Medicaid licensing and qualification regulatory requirements.  136 S. Ct. at 1997–98, 2000–01.  *Escobar* holds that by submitting a claim specifically representing what services were provided, but not disclosing material underlying regulatory violations, the defendant submitted a false claim containing a misleading half-truth.  *Id.*

The facts establishing falsity in *Escobar* are nearly identical to those here.  PCA made detailed representations about the prescription, the drugs dispensed, the prescriber, and the patient, but did not disclose that PCA had obtained the prescription, dispensed the drug, and accessed the prescriber and patient through an illegal kickback scheme.  Although identifying the patient in the claim, PCA did not disclose that it had paid a kickback to the patient by waving the patient's copayment.  When a federal health care program pays for a good or service, it does so based on the assumption that there is a legitimate need for it and that there is not the improper influence of an illegal financial incentive.  And, along the same lines, although identifying the prescriber, PCA did not disclose that the prescriber had never examined the patient in violation of state law.  When the government pays for a prescription, it expects there to be a legitimate patient-prescriber relationship underlying the recommended treatment.  PCA's representations were therefore classic examples of misleading half-truths, stating "the truth so far it goes, while omitting critical qualifying information."  *Id.* at 2000.  The representations are particularly misleading in light of PCA's earlier express promises in its provider agreement to comply with applicable fraud, waste, and abuse laws, and to collect patient copayments.  Am. Compl. ¶¶ 33–37.

PCA seems to suggest that the myriad specific representations alleged by the United States are not sufficient under *Escobar* because they are not "directly related" to the alleged omissions.  It cites no support for this concept, however, and neither *Escobar* nor the common law require it.  Instead, *Escobar* simply requires that the claim make "specific representations about the goods or services provided."  *Escobar*, 136 S. Ct. at 2001.  In such cases, non-disclosure of a material statutory, regulatory, or contractual violation associated with the goods or services will always be a misleading omission.  *See, e.g.*, *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902–03 (9th Cir. 2017) (drug names on claims implicitly represent that the drugs for which payment was requested were approved by the FDA and manufactured in compliance with FDA standards).  Moreover, even if it were required, the United States has clearly alleged a sufficient

connection between the representations that were made and the material regulatory violations that were not disclosed.

PCA also argues that, if the implied false certification theory exists on the facts alleged in the Amended Complaint, then implied false certification would be a viable legal theory for any claim knowingly submitted to federal health care programs that results from the payment of kickbacks.  But that is precisely what virtually every court—including the Eleventh Circuit—has held.  *See, e.g., McNutt*, 423 F.3d at 1260; *Eisai, Inc.*, 568 F. App'x at 799; *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3d Cir. 2011), *abrogated on other grounds by Escobar*, 136 S.Ct. 1989; *Suarez-Hoyos*, 781 F. Supp. 2d at 1278–79.  Moreover, if PCA is correct that *Escobar* precludes a finding of falsity here, then *Escobar* would have silently overruled decades of precedent holding that violations of the AKS are a basis of falsity under the implied false certification theory, which is not a plausible application of that decision.  That possibility is also foreclosed because *Escobar* expressly declined to resolve whether the implied false certification theory was viable if a claim for reimbursement did not include "specific representations" about the goods or services provided.  136 S. Ct. at 1999–2000.  The Court therefore left open the possibility that a claim could be "false or fraudulent" even if it "merely request[ed] payment," and contained no specific representations at all.  136 S. Ct. at 2000.  Since *Escobar*, numerous courts have recognized the continued viability of the implied false certification theory in such circumstances.  *See United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 n.3 (4th Cir. 2017); *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 99–100 (D.D.C. 2017); *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 198 (D.D.C. 2017).

In leaving that door open, *Escobar* left intact pre-existing Eleventh Circuit case law finding a claim can be "false or fraudulent" without imposing the additional requirement of a representation about the goods or services provided.  Specifically, in *McNutt*, the Eleventh Circuit held that the government alleged a valid claim under the implied false certification theory where the defendants submitted AKS-tainted claims to government programs, without regard to whether such claims contained "specific representations."[3]  423 F.3d at 1259–60.  Instead, the Eleventh

---

[3] Judge Bloom's Order incorrectly conflates *Escobar*'s discussion of "specific representations" with *Clausen*'s requirement of "representative claims."  Order at 12.  Although *McNutt* required that the government plead "representative claims" to satisfy *Clausen* and Rule 9(b), it did not require—as part of recognizing and applying the implied false certification theory—that the

Circuit explained that the "violation of regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed" made "the claims false" under the predecessor to Section 3729(a)(1)(A).  *Id.* at 1259.  The Eleventh Circuit did not base this conclusion on an analysis of whether the claims were bare demands for payment or contained specific representations about the goods or services provided.  Accordingly, under either the *Escobar* standard or the *McNutt* standard, PCA's claims are false.

Patrick Smith and Matthew Smith additionally argue that the Complaint must be dismissed because there is no allegation that they individually made "specific representations" to the TRICARE program.  PS MTD at 11–12; MS MTD at 14–15.  Such a requirement would directly conflict with the text of the FCA, which establishes liability not only for personally submitting a false claim to the government but also for causing another to submit a false claim.  *See* 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003) ("An argument that the presentation of the claims was the work of another is unavailing as a means to avoid liability under the False Claims Act.").  Here the allegation is not that Patrick Smith and Matthew Smith directly presented false claims, but rather that, through their actions, they caused the presentment of false claims for the reasons discussed in Section I.D., *infra*.  Moreover, numerous cases have held that defendants can be liable under the FCA for paying kickbacks, even where the claims were submitted by another person or entity.  *See, e.g., United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011); *Suarez-Hoyos*, 2012 WL 4344199, at *8.

### 2.    The Amended Complaint Alternatively Alleges that the AKS-Based Claims Are False by Operation of Section 1320a-7b(g)

Although the implied false certification theory is sufficient to establish falsity, 42 U.S.C. § 1320a-7b(g) provides additional support as to the AKS-based allegations.  The plain text of Section 1320a-7b(g) makes clear that claims submitted to federal health care programs that result from violations of the AKS are false claims under the FCA:

> In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section [*i.e.*, the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31 [*i.e.*, the FCA].

government allege what "specific representations" were made in those claims nor did its determination on falsity depend on the contents of the claims.  *Id.*

Section 1320a-7b(g)'s use of the phrase "false or fraudulent" is a direct reference to identical language in the FCA that establishes the falsity element of an FCA claim. *See* 31 U.S.C. § 3729(a)(1)(A). The only plausible reading of this statutory language is that federal claims for items and services referred under an illegal kickback arrangement are "false" claims under the FCA. Consistent with this statutory text, courts have widely recognized that Section 1320a-7b(g) establishes the falsity element of AKS-based FCA claims. *See Carrel*, 898 F.3d at 1272; *Guilfoile*, 913 F.3d at 190; *Novartis*, 43 F. Supp. 3d at 363; *Marder*, 2015 WL 13264207, *3; *Medco,* 880 F.3d at 94–95; *United States ex rel. Lutz v. Blue Eagle Farming, LLC*, 853 F.3d 131, 135 (4th Cir. 2017); *Biogen*, 2018 WL 1996829, *5–6; *Allergan*, 246 F. Supp. 3d at 812–13; *United States ex rel. Wheeler v. Union Treatment Centers, LLC*, No. SA-13-CA-4-XR, 2019 WL 571349, at *5 & n.5 (W.D. Tex. Feb. 12, 2019); *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1053 (C.D. Cal. 2016).

Although the plain text of Section 1320a-7b(g) and the relevant case law all unambiguously support the government's reading of the statute, PCA makes no attempt to explain why these cases are wrongly decided or cite a single case that proposes an alternative reading of the statute. Nor does PCA offer a plausible explanation for the function of Section 1320a-7b(g), if not supplying the falsity (and materiality) of AKS-tainted claims. PCA instead argues that Judge Bloom rejected the proposition that Section 1320a-7b(g) establishes the falsity element of an FCA claim. But the Court's Order does not analyze whether Section 1320a-7b(g) establishes the falsity of claims to federal health care programs under the FCA. The Court merely noted that "an alleged violation of the AKS" is not "sufficient in and of itself to state a claim under the FCA," and that an FCA plaintiff must *also* allege that AKS-tainted claims were submitted to the government. Order at 7–8. The government's position with respect to Section 1320a-7b(g) is entirely consistent with that observation. In particular, the government contends only that Section 1320a-7b(g) satisfies the *falsity and materiality* elements of an FCA claim predicated on AKS violations. The government or a relator, however, must still allege the existence of an AKS violation and, as the Court noted, that defendants submitted or caused the submission of a claim resulting from the AKS violation to a federal health care program. Therefore, the government's reliance on Section 1320a-7b(g) to establish falsity and materiality is appropriate and consistent with the framework discussed in Judge Bloom's Order.

Finally, PCA asserts that the government's position is "inconsistent" with the position it has taken before the United States Court of Appeals for the Fifth Circuit in *Texas v. United States*, No. 19-10011 (5th Cir.). PCA MTD at 14. There is no such inconsistency. The district court in the Texas case held that the PPACA was rendered invalid as of January 1, 2019, when Congress eliminated the tax penalty for individuals who fail to comply with the PPACA's individual mandate and thus eliminated the only constitutional basis for the individual mandate. The court further held that this provision was inseverable from the remainder of the PPACA so the entire statute was rendered invalid. This does not, however, affect the validity of the PPACA before January 1, 2019. Because the individual mandate was a valid exercise of Congress's tax power up until January 1, 2019, the Department's defense of the district court's decision in *Texas v. United States* has no effect on cases that rely on the PPACA provisions for conduct that occurred before that date. This case is thus unaffected by the position in the Texas case. The Southern District of Florida recently rejected a criminal defendant's bid for a mistrial and dismissal of health care charges against him on the basis of the United States' position in the Texas litigation, similar to the arguments PCA makes here. *United States v. Esformes*, No. 1:16-cr-20549 (S.D. Fla.), Dkt. Nos. 1206, 1217, 1235.

## 3.   The Amended Complaint Alleges Facts Sufficient to Support the Express False Certification Theory of Falsity

The Complaint also alleges falsity under an express false certification theory based on express promises in PCA's provider agreement. Judge Bloom rejected the express false certification theory because the promises in the provider agreement were not false when made and were not made as part of the claims submission process. Order at 8–10. The United States respectfully disagrees to the extent that other courts have held or indicated that falsity exists under an express false certification theory based on prospective promises made in a provider agreement, even in the absence of evidence that the defendant intended to violate those promises at the time the provider agreement was executed. *See, e.g.*, *Eisai*, 568 F. App'x at 799; *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2013 WL 1289260, *4 (S.D. Fla. Mar. 27, 2013); *Allergan*, 246 F. Supp. 3d at 814; *see also Blackstone*, 647 F.3d at 393 (rejecting the implied/express false statement framework and concluding that prospective promises in the provider agreement establish that subsequently submitted claims are false).

18

The fact that a defendant did not set out to violate the law at the time of an initial promise does not insulate that defendant from FCA liability if the defendant fails to alert the government to changed circumstances that bear on its continued entitlement to payment.  A failure to correct or update a prior statement may support a claim for fraud or misrepresentation if the statement is material to an ongoing transaction.  *See* Restatement (Second) of Torts, § 551(2) (1977) ("One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, … (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so . . . .").

The duty to update or disclose non-compliance with a promise applies with particular force in the FCA context.  Unlike an action for common law fraud, an FCA claim premised on a promise to perform necessarily involves a subsequent act by the defendant beyond the promise itself—the submission of a claim for payment.  *Osheroff*, 2013 WL 1289260, at *3–4 (defendant's certification in Medicare provider agreement that it agreed to comply with the AKS and subsequent submission of a claim in violation of the AKS "qualifies as perpetuating a fraud against the government" because defendant's promise of future compliance with the AKS was a "prerequisite and the sine qua non of federal funding"); *Allergan*, 246 F. Supp. 3d at 814 (rejecting argument that promises in Medicare provider agreement to comply with applicable laws in the future are not actionable absent a then-existing intent not to abide and concluding that precedent in the Second Circuit supports express false certification claims premised on the submission of claims arising from AKS violations after a provider agreement was signed).

### C.    PCA's Claims Are "Materially" False

The Amended Complaint sufficiently alleges that the violations of the AKS and patient-prescriber laws would affect the government's payment decision, or, in other words, that the violations were "material."

In *Escobar*, the Supreme Court held that, in analyzing materiality, courts should look to the "likely or actual effect" of the fraudulent conduct on the government's payment decision.  136 S. Ct. at 2002.  This analysis is undertaken either from the perspective of a reasonable person or of the defendant.  *Id.* at 2002–03.  Thus, a matter is material (1) if a reasonable person "'would attach importance to it in determining a choice of action in the transaction'"; or (2) "if the defendant knew or had reason to know that the recipient of the representation attaches importance

to the specific matter 'in determining his choice of action,'" regardless of whether a reasonable person would do so.  *Id.*  (citing Restatement (Second) of Torts § 538, at 80).  A variety of factors bear on the materiality inquiry, including whether the requirement was labeled a "condition of payment," whether the violation is significant or "minor or insubstantial," *id.* at 2003, whether the violation goes to the "essence of the bargain," *id.* at 2003 n.5, and the actions the government took in this or other cases where the government had knowledge of similar violations, *id.* at 2003–04. The list of factors in *Escobar* is not exhaustive nor is any one particular factor required to establish materiality.  It is therefore not necessary to plead each of these factors to survive a motion to dismiss.  *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) ("None of these considerations is dispositive alone, nor is the list exhaustive.").

Applying this standard, Magistrate Judge Valle previously concluded that the complaint sufficiently alleged materiality as to both the AKS violations and the patient-prescriber violations. *See* R&R at 21–22.

### 1.   The AKS Violations Are Material

Every one of the factors identified in *Escobar* weighs in favor of materiality of the AKS violations.  Just as courts have with near unanimity recognized that claims resulting from violations of the AKS are false under the FCA, they too have widely acknowledged the materiality of AKS violations, both before and after the *Escobar* decision.  *See McNutt*, 423 F.3d at 1259 (pre-*Escobar*); *Blackstone*, 647 F.3d at 392–95 (pre-*Escobar*); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614–16 (N.D. Ill. 2003) (pre-*Escobar*); *United States ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 127–28 (D. Mass. 2011) (pre-*Escobar*); *Amgen*, 812 F. Supp. 2d at 50–56 (pre-*Escobar*); *Guilfoile*, 913 F.3d at 190 (post-*Escobar*); *Allergan*, 246 F. Supp. 3d at 818 (post-*Escobar*); *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, No. 9:14-cv-230, 2017 WL 6015574 (D.S.C. Dec. 4, 2017) (post-*Escobar*); *United States ex rel. Capshaw v. White*, No. 3:12-cv-4457, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018) (post-*Escobar*).

Far from being a minor or insignificant regulation, the AKS is a criminal law, a violation of which is a felony punishable by up to ten years in prison and fines of up to $100,000.  *See* 42 U.S.C. § 1320a-7b(b)(2); *see also Novartis*, 43 F. Supp. 3d at 363 ("AKS violations are not mere technicalities"); *Capshaw*, 2018 WL 6068806, at *4 ("AKS violations are not the 'garden-variety breaches of contract or regulatory violations' that the Supreme Court sought to shield from the wrath of the FCA.").  The government "routinely punishes AKS violations through criminal

proceedings and civil proceedings to recoup funds." *Berkeley Heartlab*, 2017 WL 6015574 at *2. Indeed, it has done so here by intervening in this litigation, obtaining the criminal conviction of a marketer for PCA after a jury trial, securing multiple convictions by guilty plea in related criminal matters, and pursuing other administrative remedies. Am. Compl. ¶¶ 197–200. Violations of the AKS may lead to suspension or exclusion from participation in the TRICARE program and denial of the pharmacy's claims, *see* 32 C.F.R. § 199(b), (f), and DHA has exercised its authority to suspend providers for payment of kickbacks, Am. Compl. ¶ 205.

Nor was the conduct here minor or insignificant. The kickbacks to the three marketers—totaling in excess of $33 million—resulted in approximately $72 million in paid claims by TRICARE. *Id.* ¶¶ 93–95, 209. Likewise, the kickbacks to patients in the form of copayment waivers resulted in approximately $16 million of paid claims by TRICARE. *Id.* ¶ 210. No reasonable person—particularly a reasonable person operating a business in the health care arena—could conclude under these circumstances that violations of the AKS alleged in the Complaint were not likely to influence the government's payment decision. Because the government did not have knowledge of the kickback scheme at the time when PCA was submitting tainted claims, and Defendants never notified the government of the kickback scheme, *id.* ¶ 206–07, the government's payments in 2014 and 2015 while the scheme was ongoing cannot be used by defendants to argue that the violations were not material.

Moreover, the materiality of the AKS is underscored by Congress's decision to make claims to federal health care programs tainted by illegal kickbacks "false or fraudulent" under the FCA. 42 U.S.C. § 1320a-7b(g). Given the unique importance of the AKS, the widespread acknowledgement by courts that compliance with the AKS affects federal health care reimbursement decisions, and the enactment of Section 1320a-7b(g), many courts have held, as the Court should here, that violations of the AKS are material under the FCA as a matter of law. *Guilfoile*, 913 F.3d at 190; *Capshaw*, 2018 WL 6068806, at *4; *Berkeley Heartlab*, 2017 WL 6015574, at *2; *Allergan*, 246 F. Supp. 3d at 818.

In light of the government's allegations and the case law, Defendants have no credible argument that the AKS violations would not have affected the government's payment decision;

they fail to identify a single case holding that violations of the AKS are not material.[4]  Instead, PCA and Matthew Smith claim that the Amended Complaint's materiality allegations are "conclusory," and assert that various individual allegations are "insufficient."  PCA at 10–13; MS MTD at 16–18.  Magistrate Judge Valle has already rejected these arguments.  R&R at 21–22. Rightly so.  There is nothing conclusory about the government's allegations: the government has alleged with particularity a massive fraud scheme involving tens of millions of dollars in kickbacks paid by PCA for TRICARE referrals; that the government was not aware of the fraud at the time; that the AKS is a criminal law; that the government routinely pursues criminal and civil charges in response to violations of the AKS; that the government has done so in response to the very kickback schemes at issue in this case; that compliance with the AKS is a condition of payment; and that, had the government known of the fraud schemes, it would not have paid PCA's claims. Am. Compl. ¶¶ 1–2, 209–10, 189–200, 205–208.  There is nothing general or speculative about these allegations, and they establish that every factor identified in *Escobar*'s materiality test favors a finding of materiality here.[5]

## 2.    The Patient-Prescriber Violations Are Material

Likewise, the United States has sufficiently alleged materiality of the patient-prescriber allegations, as Magistrate Judge Valle has previously concluded.  R&R at 21–22.  Like *Escobar*'s example of a gun that does not shoot straight, a prescription drug claim that lacks a valid prescription is obviously material because it goes to the very essence of what the government is

---

[4] PCA's reliance on *Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, and *United States ex rel. Kester v. Novartis Pharms. Corp.*, 2015 WL 109934 (S.D.N.Y. Jan. 6, 2015), is misplaced.  *See* PCA MTD at 11.  Both of these cases pre-date *Escobar*, they rely on First Circuit precedent overruled by *Escobar* that implied false certification applies only to provisions expressly designated as conditions of payment, and they do not concern materiality. Moreover, these cases actually support the United States' position because they conclude that TRICARE prescription drug claims submitted after the 2010 enactment of Section 1320a-7b(g) *are actionable* under an implied false certification theory.

[5] In a footnote in its materiality section, PCA also contends that government's allegations that the marketer agreements violated the AKS are conclusory because the marketers' failure to qualify for the bona fide employee safe harbor does not mean that the arrangements necessarily violated the AKS.  PCA MTD at 10, n.6.  That is a red herring.  Obviously, failing to meet a safe harbor alone does not automatically mean there has been a violation of the AKS.  The Amended Complaint contains detailed allegations establishing an affirmative violation of the AKS.  The allegations concerning the safe harbor merely underscore and add context to the conduct of the Defendants.

paying for.  *See Escobar*, 136 S. Ct. at 2003 n.5.  The fact that not merely a handful of such claims, but thousands of them, were submitted as a result of the scheme where no legitimate patient-physician relationship existed further establishes that the violations at issue here were not minor or insignificant.  Moreover, TRICARE was unaware of the conduct of the Defendants at the time it was paying the claims, meaning that the government's conduct is not evidence that the violations were not material.   In light of these allegations, any reasonable person would have known that the government would have considered the lack of a patient-prescriber relationship to be material.  The fact that Defendants made false statements to the contrary to CBS, in an attempt to conceal PCA's actions, further underscores this point.  Am. Compl. ¶ 181; *see Triple Canopy*, 857 F.3d at 178 (noting defendant's own actions to cover up its conduct contributed to a finding of materiality).

### D.     The Complaint Sufficiently Alleges Scienter and Causation as to Each Defendant

The Amended Complaint sufficiently alleges scienter and causation as to each Defendant.  Under the FCA, a person acts knowingly if he or she has actual knowledge, acts with deliberate ignorance to the truth or falsity of  information, or acts in reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1).  No specific intent to defraud is required.  *Id.*  Because Rule 9(b) allows for knowledge to be pleaded generally, knowledge in an FCA case need only meet the plausibility standard of Rule 8(a)(2).   Regarding scienter, as the Eleventh Circuit has explained, "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." *Vernon*, 723 F.3d at 1256.

As for causation, under the FCA, a defendant may be liable not only when it presents false claims to the government, but also when the defendant "causes [such claims] to be presented."  31 U.S.C. § 3729(a)(1)(A).  Courts rely on traditional principles of causation in tort law to determine whether a defendant may be held liable under the FCA for causing others to submit false claims. *Blackstone*, 647 F.3d at 391–92; *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006); *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 244–45 (3d Cir. 2004).  Causes are proximate where they have a natural and foreseeable tendency to produce the harm in question, directly relate to that harm, and constitute a substantial factor in bringing about the harm.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (foreseeability and directness); Restatement (Second) of Torts § 431 (1965) (substantial factor); *see also United States ex rel. Keeler v. Eisai, Inc.*, No. 09-cv-22302, 2011 WL 13099033, at *4

(S.D. Fla. June 21, 2011) (noting that appropriate test for proximate causation is foreseeability). Courts have routinely found that kickback arrangements are a substantial factor in and proximately cause the submission of claims, even when the participant in the kickback scheme did not actually submit the claims themselves. *Suarez-Hoyos*, 2012 WL 4344199, at *8.

### 1.   PCA's Scienter and Causation

Defendant PCA does not challenge the sufficiency of the Amended Complaint's allegations with respect to its scienter and causation, and the government therefore does not address these elements as to PCA.

### 2.   RLH's Scienter and Causation

The Amended Complaint plausibly alleges that RLH knowingly caused the submission of claims resulting from kickbacks to the three marketer groups.   The allegations against RLH are extensive, specific, and conclusive.   Magistrate Judge Valle has previously found that the original complaint sufficiently alleged RLH's scienter and causation as to the marketer kickback scheme. R&R at 22–23, 27.   In the Amended Complaint, the United States adds further allegations supporting a showing of causation and knowledge, a summary of which follows.

RLH is the investment management company for "Fund III," a private equity investment vehicle that in July 2012 purchased PCA and managed the company through two RLH principals, Michel Glouchevitch and Kenneth Hubbs.   Am. Compl. ¶ 6.   Shortly after the acquisition, PCA's profitability was jeopardized as reimbursement declined on compounded nutritional therapy for end-stage renal disease patients.   *Id.* ¶ 50.   To restore profitability, RLH directed that PCA enter into non-sterile topical compounding given its high reimbursement—while recognizing ethical concerns with the high margins and that the margins would likely not last—with the intention of "making hay while the sun shines." *Id.* ¶ 51–55.   In early 2014, RLH recruited and hired Patrick Smith as CEO to direct this business line.   *Id.* ¶ 57.   RLH insisted on "Joint Decision Making" with him on various issues concerning PCA, and required RLH approval of significant contracts, annual budgets, employment decisions, and issuing stock options.   *Id.* ¶ 60.   Under its joint decision-making authority, RLH approved of PCA's plan to enter into contracts with independent marketers—instead of using employed sales staff—to generate prescriptions for topical creams. *Id.* ¶¶ 65, 79, 82, 98.   By the end of 2014, RLH knew all the necessary facts to conclude that PCA was likely violating the AKS under the contracts it had approved, namely that PCA was paying

50% commissions to the marketers for referrals of prescriptions that were being billed to TRICARE.  *Id.* ¶¶ 84–86, 97–98.

In 2015, PCA's revenue from the non-sterile business line, driven by marketer kickbacks, exploded.  As business poured in, RLH received numerous acute warnings alerting it to the illegality of the kickback schemes, even as it took additional steps to further the payment of kickbacks.  On January 23, 2015, Hubbs sent a calendar invite for an upcoming PCA Board of Directors meeting scheduled to take place on January 27, 2015.  *Id.* ¶ 169.  At the top of the invite was a note that "Stark laws prohibit third party incentive payments for RX referrals."[6]  *Id.*  This note was written just three days after Attorney John Morrone advised Patrick Smith that the marketer arrangements were highly suspect if not outright illegal, *id.* ¶ 168, raising the inference that Morrone's opinion was communicated to Hubbs.  The Board of Directors meeting took place as scheduled on January 27, 2015.  Rather than ending the kickback payments, during the Board of Directors meeting, RLH rewarded Matthew Smith—who had devised and executed the kickback scheme—with a stock option package worth $200,000.  *Id.* ¶ 102.  Two days later, RLH sent a wire transfer of $2 million to PCA in order to finance PCA's payment of kickbacks to the marketers.  *Id.* ¶ 104.  Shortly after, on February 4, 2015, Hubbs circulated a revised 2015 budget forecasting $159 million in revenues and $75 million in kickbacks, these figures more than doubling from the estimates in a 2015 budget circulated just three weeks prior.  *Id.* at ¶¶ 85, 87, 90.

On February 10, 2015, Hubbs received an opinion from a third party auditor, Marcum LLP, that contained a section entitled "Significant Risks" which "strongly suggested" obtaining legal advice to determine whether the marketer arrangements violated the AKS.  *Id.* ¶ 170.  On February 17, 2015, Hubbs forwarded a referral for an attorney from the law firm Quarles & Brady LLP to Glouchevitch, who responded, "is there a big cautionary message coming?  I fear yes."  *Id.* ¶ 171.  RLH spoke with this attorney but ultimately did not engage him; instead PCA engaged attorney David Matyas, whose firm had a longstanding relationship with RLH.  *Id.* ¶ 172.  On or about February 23, 2015, Matyas spoke to Patrick Smith and Glouchevitch, explaining that paying

---

[6] Although Hubbs, like many people, confused the Stark law and the AKS, the calendar invite clearly reflects an understanding that payment for prescription referrals is illegal.  There is no requirement of specific intent to violate the AKS or the FCA.  31 U.S.C. § 3729(b)(1); 42 U.S.C. 1320a-7b(h).

commissions to independent sales representatives was problematic under the AKS, that the AKS carried criminal penalties, and that PCA's marketers would have to be converted to bona fide employees to qualify for a safe harbor under the AKS.  *Id.*  Despite this advice, PCA, with RLH's knowledge, continued to pay kickbacks to the marketers and submit the ensuing claims to TRICARE, submitting in the next six weeks nearly $36 million in paid claims, nearly as much as TRICARE had paid PCA in the *preceding six and a half months.  Id.* ¶¶ 97, 174, 176, 179.

RLH argues that the Amended Complaint has not alleged scienter or causation, evidently ignoring the government's actual allegations summarized above.  RLH is wrong on both points.  As to scienter, RLH contends hyperbolically that there "are no allegations that RLH knew that PCA paid kickbacks to marketers." RLH MTD at 9.  But as the factual recitation above makes clear, the Amended Complaint contains ample allegations establishing just that.  RLH ignores that scienter under the FCA includes not only an "actual knowledge" standard but also a "reckless disregard" or "deliberate indifference" standard, and a complaint therefore need only state facts sufficient to make it plausible that RLH acted under this standard.  The Amended Complaint clears this low bar by alleging that RLH knew all the facts necessary to independently conclude that the kickback payments were illegal, that RLH was warned by at least two and possibly four or more third-parties that the marketing agreements were at risk of violating the AKS, and that RLH expressly acknowledged that the kickbacks were illegal.  The Amended Complaint also alleges facts suggesting that the high reimbursements and a desire to please its investors were motives for RLH to accept the risk of the illegality of the kickback arrangements.  There are therefore sufficient facts alleged that make it plausible that RLH acted with the requisite scienter.

It is unnecessary for the United States to plead additionally that RLH was advised the commission payments were "per se" illegal, that RLH "saw" the contracts, or that RLH was aware of the marketers' "day-to-day operations."  RLH MTD at 5, 9–10.  In *Vernon*, the Eleventh Circuit rejected almost identical arguments in the context of a criminal AKS case.  723 F.3d 1234.  In that case, the Eleventh Circuit overturned an order of acquittal by the trial court after a jury had found a CFO guilty of AKS violations.  The Eleventh Circuit rejected the argument that a defendant must be advised commission payments to a referral source are *per se* illegal to support a finding of willfulness under the AKS.  *Id.* at 1258–59 & n.8.  Instead, the court recognized that defendant's "effort to fit the relationship within a safe harbor provision" allowed a jury to infer that the defendant believed that the relationship was illegal.  *Id.*  Additionally, the Eleventh Circuit rejected

the argument that willfulness under the AKS required evidence that the defendant was directly involved in contracting with the referral source or was aware of the exact services provided under the contract. *Id.* at 1256–57 & n.7. Although *Vernon* is a criminal AKS case, its conclusion is equally applicable in the FCA context and disposes of RLH's scienter argument.

RLH separately argues that the Amended Complaint fails to allege its knowledge of the materiality of the AKS. RLH MTD at 10–11. As an initial matter, RLH continues to misstate the standard for materiality, which under *Escobar* may be based either on the perspective of a reasonable person or based on the perspective of the actual defendant, if the defendant had particular reasons to know of materiality in a circumstance where a reasonable person would not. 136 S. Ct. at 2002–03. The Amended Complaint contains sufficient allegations to show that defendants' legal violations were material to the government's payment decision under a reasonable person standard, as argued above in the materiality section at Section I.C., *supra*. But, in any event, the Amended Complaint also alleges numerous facts that make it plausible that RLH likewise knew of, willfully ignored, or recklessly disregarded the materiality of the AKS. That is the case not only because of the advice of counsel and auditors, Hubbs's recognition of the illegality of paying commissions for prescription referrals, and the Eleventh Circuit's observation that paying kickbacks for referrals is "hardly the sort of activity a person might expect to be legal," *Vernon*, 723 F.3d at 1256, but also because PCA's compliance with the AKS was material to Fund III's decision to purchase the pharmacy in 2012, as evidenced by the fact that the purchase agreement—signed by Glouchevitch—required representations and warranties about PCA's compliance with the AKS. Am. Compl. ¶ 156.

As to causation, RLH asserts that the government fails to allege that "RLH took 'affirmative acts' to 'cause or assist the presentation of a fraudulent claim.'" RLH at 11 (quoting *Sikkenga v*, 472 F.3d at 714). But the Amended Complaint alleges a number of affirmative steps in furtherance of this scheme, including: directing PCA's entry into non-sterile compounding based on its high reimbursement, approving the marketer kickback arrangements, financing the payment of kickbacks through a $2 million dollar promissory note approved only days after Hubbs acknowledged that those payments were illegal, and rewarding Matthew Smith with a $200,000 stock package while knowing that the marketer kickback contracts he devised were illegal. Under a tort law standard, it is foreseeable that these actions would result in TRICARE claims, and they are directly related to and a substantial factor in bringing about the submission of AKS-tainted

TRICARE claims.  RLH has no argument for why these allegations are insufficient to establish an "affirmative act"; it simply ignores the allegations.

The facts here are readily distinguishable from the inaction or attenuated link between the presentation of the claim and the conduct of the defendants in the cases relied on by RLH.  *See United States ex rel. Camillo v. Ancilla Sys., Inc.*, No. 03-CV-0024, 2005 WL 1669833, at *4 (S.D. Ill. July 18, 2005) (setting up billing system that was used by co-defendant that submitted false claims is insufficient conduct to support FCA liability); *United States ex rel. Piacentile v. Wolk*, 1995 WL 20833, at *4 (government alleged "no actions on the part of defendant . . . that constitute 'presenting, or causing to be presented' a false or fraudulent claim").  And the government's allegations far exceed those in *United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. 15-13065-PBS, 2018 WL 4539684 (D. Mass. Sept. 21, 2018), where a district court found that causation was adequately alleged against a private equity company and the CEO of a portfolio company because they were informed that the portfolio company was violating the law, but nevertheless "knowingly ratified the prior policy of submitting false claims by rejecting recommendations to bring [the portfolio company] into regulatory compliance."  *Id.* at *4.[7]

Finally, the Amended Complaint has sufficiently alleged RLH's scienter and causation with respect to the patient-prescriber and copayment waiver theories.  Recognizing that Magistrate Judge Valle has recommended dismissal on these two theories, R&R at 25, the United States respectfully submits that it has alleged sufficient facts to demonstrate that RLH acted in willful disregard or deliberate indifference to whether PCA was submitting claims to TRICARE that violated patient-prescriber laws and for which a copayment was not collected.

---

[7] RLH also argues that the representative claims are insufficient to establish its causation.  RLH MTD at 13–14.  But the representative claims indicate that RLH caused the submission of the false claims because of the conduct alleged earlier in the Amended Complaint—*i.e.*, the approval of the kickback contracts, the funding of kickbacks, etc.—and refers back to these allegations.  *See, e.g.,* Am. Compl. ¶¶ 225, 239, 253, 267, 281, 310, 325, 339 ("RLH . . . knowingly caused the submission of this claim *as alleged in paragraphs 1 through 210 above*." (emphasis added)).  And contrary to RLH's suggestion, the Amended Complaint does identify particular individuals at RLH who committed these acts, namely Hubbs and Glouchevitch.

### 3.   Patrick Smith's Scienter

The Amended Complaint likewise sufficiently alleges Patrick Smith's scienter.[8]  With respect to the marketer kickback allegations, Magistrate Judge Valle previously concluded that the Complaint sufficiently alleges Patrick Smith's scienter.  R&R at 25. Among other things, the Amended Complaint alleges:

- In summer of 2014, Patrick Smith was advised by PCA's in-house lawyer, David Corcoran, that PCA should not bill government programs for prescriptions referred by the marketers, and that it should not pay doctors or allow independent marketers to pay third-party referral sources, Am. Compl. ¶ 166;

- By December 2014, Patrick Smith was aware of all the facts necessary to conclude that the marketer arrangements likely violated the AKS, namely that PCA was paying 50% commissions to the marketers for referrals of prescriptions that were being billed to TRICARE, *id.* ¶¶ 84–86, 97–98;

- In December 2014, attorney David Corcoran, after learning that TRICARE was responsible for the majority of the revenue, advised Patrick Smith that he seek advice from an experienced health care attorney, *id.* ¶ 167;

- In January 2015, attorney John Morrone advised Patrick Smith that PCA's relationships with its marketers were highly suspect, if not outright illegal, and would not fall under the bona fide employee safe harbor, *id.* ¶ 168;

- In March 2015, attorney David Matyas advised Patrick Smith that the marketer arrangements were problematic under the AKS, that the AKS was a criminal law, and that the marketers would need to be converted to bona fide employees to qualify for that exception to the AKS, *id.* ¶ 172;

- Also in March 2015, Matyas advised Patrick Smith in an email that "the Anti-Kickback Statute makes it a criminal offense to knowingly and willfully offer, pay, solicit or receive any remuneration to induce referrals or services reimbursable by the federal or state health care programs." Matyas further advised that a W-2 employment relationship with the marketers is "a key to minimizing exposure" and that if the marketers "are characterized as having a W-2 employment relationship with PCA, then you should take comfort that the incentive payments are otherwise protected from prosecution under the Anti-Kickback statute," *id.* ¶ 173;

- Also in March 2015, PCA initially determined that it would convert the marketers to W-2 employees, but delayed the conversion because Patrick Smith knew the reimbursements for TRICARE were set to decline in early May 2015, and in that time PCA significantly increased the amount of kickback-tainted claims it submitted to the TRICARE program, billing nearly as much in

---

[8] Patrick Smith's motion to dismiss does not contain argument concerning causation.

approximately six weeks as it had in the preceding six and a half months, *id.* ¶¶ 176, 179;

- In May 2015, Patrick Smith falsely stated, in statements recorded for CBS, that PCA was focused on the best clinical outcome for patients; that PCA worked closely with physicians; that PCA received prescriptions only from doctors; and that PCA required all patients to pay their copayments, ¶ 181.

These facts make it plausible that Patrick Smith actually knew, recklessly disregarded, or deliberately ignored that prescriptions referred under the marketer arrangements violated the AKS and were therefore not reimbursable by TRICARE.   Patrick Smith contends that the Complaint does not sufficiently allege his scienter because he sought legal advice concerning the marketer kickbacks and the legal advice did not include a specific directive to stop billing TRICARE or reimburse TRICARE for previously paid claims.  As an initial matter, this argument fails for the simple reason that the Amended Complaint *does* allege that Patrick Smith was directed by attorney David Corcoran in summer of 2014 not to bill government programs for prescriptions referred by the marketers.  Am.  Compl. ¶ 166.  Moreover, multiple attorneys provided advice that, taken together, was enough for Patrick Smith to conclude that that the marketer arrangements were illegal or were very likely to be illegal.  A showing of scienter does not require a specific directive from counsel to stop violating the law.

With respect to the waiver of copayments, the Magistrate Judge previously concluded that there was not sufficient evidence that Patrick Smith knew that patient copayments were waived. The United States amended the complaint to include additional allegations showing that Patrick Smith understood just that.  Namely, Patrick Smith signed two checks dated February 6, 2015, and February 23, 2015, from PCA to PFARN, a fraudulent charity established by TeleMedTech to fund the copayments for patients referred to PCA by that marketer.  Am. Compl. ¶¶ 125–26.  The face of the checks make clear that PFARN was related to TeleMedTech.  *Id.*  The checks also expressly state that the payment was for "December 2014 Co-Pay" and "January 2015 Co-pay 50%."  *Id.*  Finally, the checks collectively total approximately $9,000, suggesting that copayments were being waived for hundreds of patients given that TRICARE copayments are typically less than $20.  *Id.*  Moreover, Patrick Smith had previously been warned by RLH that routine waiver of copayments could violate the AKS.  *Id.* ¶ 161.  On these facts, it is more than plausible that Patrick Smith knew or recklessly disregarded that PCA was routinely waiving patient copayments through the PFARN sham charity, and that this conduct violated the AKS.

30

Patrick Smith contends that there is "no new information provided by these allegations." PS MTD at 6. But to the contrary, the new allegations show why his signing the checks is a plausible basis for scienter. Patrick Smith also takes issue with the government characterizing PFARN as a "sham" charity in prior briefing, and he claims that the government's allegations do not show that Smith understood the charity was a "sham." Patrick Smith's objection is somewhat puzzling, because both the Complaint and the Amended Complaint allege that PFARN is a "sham charitable organization," and that contention is supported by the allegations that the entity did not verify patient financial need and instead existed solely to avoid losing business on customers who could afford to but did not wish to pay a copayment. Am. Compl. ¶¶ 119–120. Moreover, the "sham" nature of PFARN is evident on the face of the check, given that the checks Patrick Smith signed make clear that PCA was splitting the costs of copayments with PFARN, that the entity was affiliated with TeleMedTech, and that the copayment waivers were routine.

The Magistrate Judge also found that the complaint did not sufficiently allege Patrick Smith's knowledge with respect to the patient-prescriber scheme, because he received only one patient complaint. R&R at 25. The United States respectfully disagrees and believes these allegations are sufficient to put Patrick Smith on notice of the fraud scheme, particularly in light of the fact that he knew that the marketers were being paid tens of millions for referrals, and that marketer referrals and reimbursement from TRICARE were exponentially increasing at that time. On these facts, the patient complaint was a red flag that the marketers were referring prescriptions that should not have been billed to federal programs.

### 4.   Matthew Smith's Causation

The Amended Complaint amply pleads that Matthew Smith caused the submission of false claims.[9] As the R&R rightly concluded with respect to the original complaint, the United States alleges a sufficient nexus between the submission of false claims pursuant to the marketing kickback scheme and Matthew Smith's negotiation of the contracts to pay the marketers a percentage of PCA's profits from prescriptions referred by them and his actions ensuring the commissions on the prescriptions were paid to the marketers in accordance with the contracts. *See* R&R at 26–27; *see also* Am. Compl. ¶¶ 80–81, 96. Without this conduct by Matthew Smith, the kickback arrangement would not have existed or continued.

---

[9] Matthew Smith's motion to dismiss does not contain argument concerning scienter.

The Amended Complaint also sufficiently pleads Matthew Smith's liability for causing PCA to submit false claims pursuant to the copayment waiver and patient-prescriber schemes. The Amended Complaint alleges that Matthew Smith devised and executed the PFARN copayment waiver scheme with Steve Miller, *id.* ¶¶ 119–132, monitored the profitability of the prescriptions that were received from telemedicine doctors and encouraged pharmacy staff to adjust formulas to maximize profit, ¶¶ 136–139, and instructed staff not to reverse claims in response to patient complaints, ¶¶ 146–153. These actions are sufficient to show that Matthew Smith was the primary driver, and certainly a contributing cause, of the copayment waiver and patient-prescriber schemes. *See* R&R at 27–28 (finding the original complaint adequately alleged that Matthew Smith caused the submission of false claims under the copayment waiver and patient-prescriber schemes).

Obtaining TRICARE funds was plainly a foreseeable result of the alleged schemes because the marketers targeted TRICARE patients given that TRICARE reimbursement was particularly profitable, and the schemes would have generated no profit absent submission of claims to TRICARE and other insurers. *See* Am. Compl. ¶¶ 84, 86, 107, 117, 137, 140, 144, 151. The alleged facts thus readily establish that Matthew Smith proximately caused the presentment of TRICARE claims pursuant to the marketer kickback, copayment waiver, and patient-prescriber schemes.

There is no requirement that the United States allege Matthew Smith submitted any of the nine representative claims, directed another person to submit one, or was aware one had been submitted. *See* MS MTD at 7. The Amended Complaint alleges that Matthew Smith caused the submission of each representative claim because of his actions highlighted above, which are detailed in paragraphs of the Amended Complaint preceding the representative claims. *See, e.g.,* Am. Compl. ¶¶ 239, 253, 267. Courts have routinely held causation is adequately alleged where the defendant's participation in a kickback scheme is a substantial factor in bringing about the false claims, even when the defendant was not involved in the submission of claims. *See, e.g., Zimmer*, 386 F.3d at 244 (holding causation adequately alleged where defendant, although not itself submitting claims, must have known that by inducing providers to violate the AKS, the defendant would be causing them to falsely certify compliance with that law); *Suarez-Hoyos*, 2012 WL 4344199, at *7–8 (holding defendant's participation in a kickback arrangement could cause the submission of false claims even if he did not participation in, or control, the claims submission process). The Court should therefore hold the United States sufficiently pleads that Matthew Smith

32

caused the submission of false claims to TRICARE through his participation in each scheme alleged in the Amended Complaint.

## II.     The Complaint Adequately Alleges A Claim For Use of False Records Or Statements Under 31 U.S.C. § 3729(a)(1)(B)

The United States sufficiently alleges Defendants' liability under Section 3729(a)(1)(B) arising from the use of false or fraudulent prescriptions and promises of compliance in PCA's provider agreement with TRICARE's pharmacy benefits manager ESI.  The plain language of Section 3729(a)(1)(B) makes clear that liability attaches when a material record or statement is knowingly false or fraudulent at the time it is *used* to obtain payment, not merely when it is initially made.  *See* 31 U.S.C. § 3729(a)(1)(B) (imposes civil liability on any person who "knowingly makes, *uses*, or *causes to be* made or *used*, a false record or statement material to a false or fraudulent claim" (emphasis added)).  The government's original complaint did not include a count under Section 3729(a)(1)(B), and therefore Judge Bloom did not rule on this issue in her prior order.

While Eleventh Circuit case law generally addresses circumstances in which a defendant allegedly *made* false or fraudulent statements, it does not preclude liability under Section 3729(a)(1)(B) (previously codified at 31 U.S.C. § 3729(a)(2)) for statements that were false or fraudulent at the time they were *used*, but not at the time they were made.  *See generally Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015); *Hopper*, 588 F.3d at 1328. The Fifth Circuit's decision in *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648 (5th Cir. 2004), confirms the sufficiency of showing a statement was false or fraudulent at the time it was used to obtain payment.  *Bain* involved the FCA's "reverse false claim" provision (then codified at 31 U.S.C. § 3729(a)(7)), which imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  In that case, there was a dispute as to whether the "obligation to pay" was fixed at the time the defendant's false statement was made, but the Fifth Circuit concluded if the defendant "knowingly uses (or causes to be used) a false statement" to reduce the amount of a then-fixed obligation, "it would not seem to matter that *when* the statement was *made* the obligation was merely contingent and unfixed."  *Bain*, 386 F.3d at 657 (emphasis in original).

The United States has thus sufficiently alleged liability under Section 3729(a)(1)(B) arising from the promises of compliance in PCA's provider agreement with ESI.  The Amended Complaint explains in detail that PCA "used" the initial promises of compliance in its provider agreement with ESI—which became false when PCA violated those requirements by engaging in the illegal kickback scheme—when it sought payment from TRICARE because PCA would not be eligible for such funding absent the entry and continued validity of the provider agreement. *See, e.g.*, Am. Compl. ¶¶ 31 (valid provider agreement prerequisite to TRICARE claim submission), 33 (compliance with "fraud waste and abuse laws" among promises in PCA's provider agreement), 212 (representative claim 1 was for a patient referred by Monty Grow pursuant to illegal kickback scheme alleged in paragraphs 1–210), 222 (PCA used provider agreement to obtain payment of representative claim 1).

The United States further alleges the false or fraudulent promises in PCA's provider agreement led the government to pay amounts it did not owe.  *See, e.g.*, *Id.* ¶¶ 43 ("TRICARE relied on the representations made by PCA at the time it paid PCA's claims, and if TRICARE had known that representations in PCA's provider agreement were false, TRICARE would not have paid these claims.").  RLH, Patrick Smith, and Matthew Smith "caused" the pharmacy to "use" the false promises in the provider agreement to obtain reimbursement from TRICARE by the affirmative steps they took in furtherance of the scheme that resulted in the submission of false claims for TRICARE reimbursement.  *See* s*upra*, Section I.D.  And the promises were knowingly false because Defendants knew, recklessly disregarded, or deliberately ignored the illegal circumstances under which the prescriptions were generated.  *See id.*

Defendants' arguments focus only on whether the statement was made with the claims. They construe Section 3729(a)(1)(B) too narrowly.  The law does not require that the false statement accompany the claim or that it is explicitly re-asserted each time a claim is made.  After all, what is the purpose of the false statement provision if not to encompass within the FCA those situations when a false statement that is material is made apart from a claim? It is to reach situations such as this one—where the existing certification is "used" by virtue of continued participation in the program as if all laws and regulations were being followed when they were not.

The United States also sufficiently alleges liability under Section 3729(a)(1)(B) arising from the use of false or fraudulent prescriptions.  The Amended Complaint alleges that PCA "used" the prescriber's identification number, prescribed ingredients, and other information from each

prescription to obtain payment from TRICARE; the prescriptions were false or fraudulent records because they were generated pursuant to the illegal kickback scheme and were not based on valid patient-prescriber relationships; a valid prescription is material to TRICARE's payment decision; the Defendants "caused" PCA to "use" the false or fraudulent prescriptions to obtain reimbursement from TRICARE by the affirmative steps they took in furtherance of the scheme that generated the prescriptions; and they knew, recklessly disregarded, or deliberately ignored the illegal circumstances under which the prescriptions were generated. *See, e.g.*, Am. Compl. ¶¶ 38–39 (valid patient-prescriber relationships required for TRICARE coverage); 41 (information from prescription submitted with claim), 108 (prescriber Dr. Paul Matthew Bolger pleaded guilty to falsely attesting, when signing prescriptions that were faxed to several pharmacies, including PCA, that he had reviewed the patients' medical records and determined the prescriptions were medically necessary, when in fact, he had not established a doctor-patient relationship with the patients or made an independent medical judgement that the drugs were medically necessary for the patients), 208 (TRICARE would have refused to pay PCA's claims had it known they did not arise from valid patient-prescriber relationships), 318 (information from prescription written by Dr. Bolger submitted for representative claim 8), 319 (prescription written by Dr. Bolger used to submit representative claim 8 did not arise from valid patient-prescriber relationship), 323 (Dr. Bolger prescription used for representative claim 8 was false record or statement); *see also supra* Section I.D (scienter and causation sufficiently alleged as to RLH, Patrick Smith, and Matthew Smith).

The United States' allegations of the Defendants' violations of Section 3729(a)(1)(B) are therefore stated with sufficient particularity to survive a motion to dismiss. *See United States ex rel. Stepe v. RS Compounding, LLC*, 325 F.R.D. 699, 707-08 (M.D. Fla. 2017) (government alleged with sufficient particularity Section 3729(a)(1)(B) claim against pharmacy and owner by alleging defendants knowingly made false statements about their prices that were material, because had TRICARE known about the false statements it would have reimbursed a lower amount).

## III.   The Complaint Adequately Alleges A Conspiracy Claim Under 31 U.S.C. § 3729(a)(1)(C)

The United States' Amended Complaint also sufficiently alleges a claim for conspiracy under Section 3729(a)(1)(C) against PCA and RLH.[10] "It is well-established that a plaintiff need

---

[10] The United States does not allege a conspiracy claim against Patrick Smith or Matthew Smith. Am. Compl. ¶¶ 350–52.

not allege that an express or formal agreement was entered into in order to establish that the parties were in agreement for the purpose of a conspiracy claim." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); *see also United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) ("The existence of an agreement may be proven by circumstantial evidence, including 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme'" (internal citation omitted)).

The facts alleged in the Amended Complaint are sufficient to plead that PCA and RLH agreed to and implemented a scheme to pay kickbacks to marketers to induce prescriptions for compounded drugs reimbursed by TRICARE. The United States alleges that RLH Partners Glouchevitch and Hubbs, as officers and/or directors of PCA, led the entry into topical compounding because of its extraordinary profitability and RLH's need, as manager of Fund III, to generate a return on Fund III's investment in PCA. Am. Compl. ¶¶ 6, 48, 52, 54. RLH (through Glouchevitch and Hubbs) agreed with PCA (through Patrick Smith) to fund the commissions that were due to the independent marketers for compounded prescriptions that Glouchevitch and Hubbs knew were reimbursed by TRICARE, a federal health care program. *Id.* ¶¶ 85–91, 97–104. And RLH (through Glouchevitch and Hubbs) agreed with PCA (through Patrick Smith) to seek legal advice regarding their payments to the marketers, and despite that advice, continued to allow claims to be submitted to TRICARE for prescriptions referred by the marketers. *Id.* ¶¶ 171–79. These allegations of PCA's and RLH's agreement and their coordination to implement the scheme are sufficient to plead a conspiracy claim under the FCA. *See Marder*, 2015 WL 13264207, at *5 (holding complaint states a claim for conspiracy under the FCA because "[t]he direct and circumstantial evidence alleged in the Complaint, read in the light most favorable to the Government, establishes that the Defendants agreed to and implemented the scheme through multiple coordinated steps.").

The case law that PCA and RLH cite in support of dismissal of the conspiracy count is inapplicable. *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009) is readily distinguishable because the relator did not identify the terms of the alleged agreement, who entered the agreement, or any evidence of any direct communication between the alleged co-conspirators. In every other case cited by PCA and RLH, the conspiracy count was dismissed because the Court concluded there was no underlying actionable FCA claim, which is no basis for dismissing the conspiracy claim against PCA and

RLH here, as the United States' claims against them under Sections 3729(a)(1)(A) and (a)(1)(B) are sufficiently pleaded for all the reasons detailed in Sections I and II, *supra*.

Finally, the intracorporate conspiracy doctrine does not bar the United States' conspiracy claim because PCA and RLH were not a single legal actor. *See Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) ("The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself.") RLH did not own PCA; it managed Fund III, a private equity fund that owned a controlling stake in PCA. Am. Compl. ¶ 6. Although RLH Partners Glouchevitch and Hubbs served as officers and/or directors of PCA, RLH was not acting solely on PCA's behalf. *Id.* RLH had an independent stake in achieving PCA's illegal objective because the success of PCA's topical compounding business would enable RLH, as manager of Fund III, to realize a "very fast payback" on Fund III's investment in PCA, which was particularly desirable for RLH given that the drop in PCA's revenues shortly after RLH caused Fund III to acquire PCA threatened to hinder RLH's plan to increase PCA's value and sell it for a profit in five years after the acquisition. *Id.* at ¶¶ 48–54.

The intracorporate conspiracy doctrine authorities cited by PCA and RLH are inapposite because none involve a defendant with a stake in the illegal activity that is separate and distinct from the company's interest. *See Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 768 (11th Cir. 2000) (intracorporate conspiracy doctrine bars a Section 1985 claim against actors who were part of a single, public entity and who allegedly conspired to interfere with civil rights); *George & Co. LLC v. Spin Master Corp*, No. 218CV154FTM38MRM, 2018 WL 5268754, at *5–6 (M.D. Fla. Sept. 13, 2018) (intracorporate conspiracy doctrine bars civil conspiracy claim against company and former owners); *Fried v. Stiefel Labs., Inc.*, No. 11-CV-20853-KING, 2012 WL 4364300, at *9 (S.D. Fla. June 8, 2012) (intracorporate conspiracy doctrine bars civil conspiracy claim against company and individuals who served as board members, officers, and shareholders); *In re Verestar, Inc.*, 343 B.R. 444, 483 (Bankr. S.D.N.Y. 2006) (intracorporate conspiracy doctrine bars civil conspiracy claims against parties that were officers, directors, or agents of parent company for purposes of claim that they conspired to breach fiduciary duties owed to subsidiary and its shareholders). Therefore, the United States' conspiracy claims against PCA and RLH under the FCA are sufficiently pleaded to survive a motion to dismiss.

## CONCLUSION

For the reasons stated above, the government respectfully asks that Defendants' motions to dismiss be denied.[11]

Respectfully submitted this 22nd day of April, 2019.

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ARIANA FAJARDO ORSHAN
United States Attorney
Southern District of Florida

SUSAN TORRES (Florida Bar No. 133590)
Attorney E-mail Address: Susan.Torres@usdoj.gov
Assistant United States Attorney
99 N.E. 4th Street
Miami, Florida  33132
Telephone: (305) 961-9331

By: */s/ Nicholas C. Perros*
MICHAEL D. GRANSTON
JAMIE ANN YAVELBERG
HOLLY H. SNOW
NICHOLAS C. PERROS
Attorney E-mail Address:  Nicholas.C.Perros@usdoj.gov
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-2879

---

[11] Should the Court grant any part of the Defendants' motions to dismiss, the United States respectfully requests that dismissal be without prejudice and that leave be granted to amend.  As discussed above, Judge Bloom previously dismissed the government's FCA count on the basis that falsity was not sufficiently alleged, finding that the complaint did not include sufficient allegations of the "specific representations" made by PCA in its TRICARE claims.  The government has corrected that deficiency in its Amended Complaint.  On April 11, 2019, the case was reassigned to Judge Altman.  ECF No. 156.  Should Judge Altman have further concerns about the sufficiency of the allegations, the government requests the opportunity to amend in order to address those concerns.

Attorneys for the United States